**SPRINGFIELD INDUSTRIES CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 87–01–00087.**

United States Court of International Trade.

May 11, 1987.

Busby, Rehm and Leonard, P.C., Washington, D.C. (John B. Rehm, Munford Page Hall II, Washington, D.C., and Jonathan Hemenway Glazier, Houston, Tex., of counsel), for the plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, New York City, Atty. in Charge, Intern. Trade Field Office (Michael P. Maxwell, attorney), for defendant.

WATSON, Judge:

This is an action brought under 28 U.S.C. § 1581(i) by an importer of wire strand seeking injunctive relief and a declaratory judgment that the product it imports from South Africa is not "steel", barred from importation under Section 320 of the Anti-Apartheid Act of 1986, as amended, 22 U.S.C. § 5070 (West Supp.1987).

In an earlier opinion in this action (Slip Opinion 87-19, February 24, 1987) the Court denied the defendant's motions to dismiss the action for lack of jurisdiction and failure to state a claim and its motion to strike the motion for declaratory judgment. At that time the Court also set an accelerated schedule for briefing the merits, into which the subsequent cross-motion for summary judgment by the government was fitted. On April 22, 1987, the Court held oral argument on the pending motions and now issues this opinion.

The product in question is known as pre-stressed concrete strand or PC strand. It is composed of six steel wires wrapped around a seventh steel wire of a slightly larger diameter. The steel wires of which it is made are manufactured from steel rod, which is one of the basic forms in which steel is produced by a steel mill.

PC strand is used to strengthen concrete for construction purposes. It is generally used by placing it under tension, pouring the concrete around it, letting the concrete set, and then releasing the tension, thereby compressing and strengthening the concrete in which it is embedded. It can also be inserted in the concrete without tension and placed under tension later.

The following sequence of events led to the ban on the importation of this product.

On October 2, 1986, Congress passed the Comprehensive Anti-Apartheid Act of 1986, Public Law 99-440 [the "Act"] over the President's veto. Apartheid is the term, of Afrikaner origin, which describes the official policy of racial segregation and political and economic discrimination against people of non-European origin in the Union of South Africa. Section 4 of the Act stated its purpose as follows:

> The purpose of this Act is to set forth a comprehensive and complete framework to guide the efforts of the United States in helping to bring an end to apartheid in South Africa and lead to the establishment of a nonracial, democratic form of government. This Act sets out United States policy toward the Government of South Africa. It also provides the President with additional authority to work with the other industrial democracies to help end apartheid and establish democracy in South Africa.

The Act contains a Title III entitled, "Measures By The United States To Undermine

Apartheid." In Title III, Section 320,[1] states as follows:

> Notwithstanding any other provision of law, no iron or steel produced in South Africa may be imported into the United States, except that any such commodity may be imported pursuant to a contract entered into before August 15, 1986, if no shipment of such commodity is imported by a national of the United States under such contract after December 31, 1986.

Section 601 of the Act, the first section of Title VI, covering "Enforcement and Administrative Provisions," provides that "the President shall issue such rules, regulations, licenses and orders as are necessary to carry out the provisions of this Act....".

On October 27, 1986, in Section 3 of Executive Order 12571 (published at 51 Fed.Reg. 39505) the President made the Secretary of the Treasury responsible for implementing Section 320.

On November 19, 1986, the Department of the Treasury, through its Office of Foreign Assets Control, published final rules which it called "South African Transaction Regulations" (published at 51 Fed.Reg. 41906) which stated as follows:

> Guidelines are being published today in a separate notice related to this final rule delineating the products subject to the importation bans affecting agriculture, articles suitable for human consumption, iron ore, iron, and steel. The U.S. Customs Service will determine whether particular merchandise is subject to exclusion pursuant to these guidelines.

On that same date the Department of the Treasury published what it called a notice of interpretation entitled "South African Transactions Regulations—Product Guidelines." (published at 51 Fed.Reg. 41911) The Guidelines in relevant part, stated, as follows:

**1.** As originally enacted, Section 320 read as follows:

> Notwithstanding any other provision of the law, no iron or steel produced in South Africa may be imported into the United States.

> This notice is published in conjunction with that final rule [the aforementioned South African Transaction Regulations] to inform interested persons of the guidelines to be employed by the U.S. Customs Service in determining which products are agricultural commodities, articles suitable for human consumption, iron ore, iron, or steel within the meaning of the Act.

The Guidelines then listed 15 categories as included within the ban of Section 320, by reference to the Item Numbers used in the Tariff Schedules of the United States (TSUS) as follows:

II. Iron Ore, Iron, and Steel

This category includes the following:

1. Iron ore-TSUS 601.24
2. Iron or steel waste and scrap-TSUS 606.08 through 606.11.
3. Pig iron, cast iron and spiegeleisen-TSUS 606.13 through 606.19.
4. Sponge iron, iron and steel powders, grit and shot-TSUS 606.55 through 606.64.
5. Ingots, blooms, billets, slabs and sheet bars-TSUS 606.67 through 606.69.
6. Iron or steel forgings-TSUS 606.71 through 606.73.
7. Bars of iron and steel-TSUS 606.75 through 606.99.
8. Hollow drill steel-TSUS 607.05 through 607.09.
9. Wire rods-TSUS 607.14 through 607.59.
10. Plates, sheets and strip-TSUS 607.62 through 609.17.
11. Wire-TSUS 609.20 through 609.76.
12. Angles, shapes, sections, and sheet piling-TSUS 609.80 through 609.98.
13. Rails, joint bars and tie plates-TSUS 610.20 through 610.26.
14. Pipes and tubes, including blanks and fittings-TSUS 610.30 through 610.92.
15. Wire products-TSUS 642.02, 642.-08, 642.11 through 642.16, and 642.20.

Pub.L. 99–440, Title III, § 320, 100 Stat. 1105. The amendment to that section was passed on November 7, 1986, to relate back to the effective date of the original act, October 2, 1986. Pub.L. 99–631 § 1(a)(21), (c), 100 Stat. 3517.

The fifteenth category included TSUS Item Number 642.11, under which plaintiff's importations are classified, which (with the irrelevant rates of duty deleted) appears as follows in the TSUS:

Strands, ropes, cables, and cordage, all the foregoing, of wire, whether or not cut to length, and whether or not fitted with hooks, swivels, clamps, clips, thimbles, sockets, or other fittings or made up into slings, cargo mets, or similar articles:

Not fitted with fittings and not made up into articles:

Not covered with textile or other non-metallic material:

Wire strand:

| 642.06 | 00 | Of nickel ................ |
| 642.08 | 00 | Of stainless steel ......... |
| 642.09 | 00 | Of copper ............... |
| 642.11 | | Other ................... |
| | | Of iron or steel (except stainless) |

The Court utilizes the standard of review provided in 28 U.S.C. § 2640(d) which, by reference to 5 U.S.C. § 706 authorizes the Court to hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiff claims that the inclusion of PC strand in the Product Guidelines is, *ultra vires*, i.e., outside the authority of the law, because it is not the "steel" covered by the law, but an advanced product made from steel. Plaintiff also claims that the inclusion of PC strand in the Guidelines is arbitrary and capricious because many other steel products of an equal or even lesser degree of advancement have not been included.

The government claims that the ban on PC strand is authorized both by the language of the Comprehensive Anti-Apartheid Act itself and by the President's constitutional authority over foreign affairs.

■ The Court treats the language of the Act first, on the theory that, if it plainly expresses a ban on products such as PC strand, there is no need to go further. On close examination, however, the Court finds that the language is rudimentary and conveys nothing more than the meaning of steel in its basic forms.

First of all, the primary meaning of "steel" is the basic material derived from iron. This is invariably the first definition given by dictionaries.[2] It is the most reasonable and most immediate understanding of a word with such a fully developed identity as a fundamental material in modern industry. This understanding is reinforced by the company in which "steel" is found, namely, linked with "iron," another fundamental term.

The government argues that dictionaries also define steel as something made of steel. The Court finds this to be a loose definition of the word, too imprecise a usage to attribute to Congress in this context. To hold that Congress intended the word "steel" to mean all steel products would be rife with inconsistencies. It would be inconsistent with Congress' careful mention of advanced products in other provisions of the same Act, inconsistent with Congress' recognition of a difference between "steel" and "steel product" elsewhere, inconsistent with an informed understanding of the term "steel" as used in industry, and inconsistent with the treatment of steel in the Tariff Schedules of the United States. Moreover, there is nothing in the legislative history to indicate that Congress was using the word "steel" in an unusually broad sense which differed from the meaning which all these other basic factors dictate.

Immediately before the ban on steel, in Section 319, Congress stated that no "agricultural commodity" of South Africa may be imported into the United States. Had it stopped there, we might think that it was using the word "commodity" in its first and

2. For example, *Webster's Third New International Dictionary* (unabridged 1963), in its first definition of "steel" states as follows: "commercial iron that contains carbon in any amount up to about 1.7 percent as an essential alloying constituent ..."

*The Random House Dictionary of the English Language* (unabridged 1969) first defines "steel" as "any of various modified forms of iron...."

broadest sense as a description of any agricultural product, no matter how advanced.[3] However, Congress actually wrote the provision as follows:

Sec. 319. Notwithstanding any other provision of law, no:

(1) agricultural commodity, product, byproduct or derivative thereof,

(2) article that is suitable for human consumption, that is a product of South Africa may be imported into the customs territory of the United States after the date of enactment of this Act.

This strongly indicates a Congressional awareness of the full range of articles which it was possible to ban, from the most basic forms to products, by-products and derivatives. When this full spectrum is missing in the very next provision, in dealing with "steel," a term which has a primary and well-developed meaning as a basic material, the contrast is dramatic and the logical inference is that Congress deliberately refrained from going beyond the banning of the basic forms to the banning of steel "products". Moreover, when Congress speaks of steel as a "commodity" immediately after it has just used the word "commodity" to describe the most basic forms of agricultural articles, it is logical to believe that Congress is describing the basic forms of steel.

This line of reasoning is further supported when, in the very next section (Section 321) Congress once again shows its understanding of a distinction between basic material and more advanced products, and of the need to specify more advanced forms by using the word "products," by providing that "no crude oil or refined petroleum product" may be exported to South Africa.

It is also noteworthy that in Section 607 of the Trade Act of 1974, 19 U.S.C. § 2485, in a provision safeguarding the use of voluntary limitations on exports of steel to the United States from attack under the antitrust laws, Congress found it necessary to mention both "steel" and "steel products."[4] The absence of the word "products" in the provision under consideration is strong evidence that Congress did not choose to go beyond the basic forms in which steel is made.

It is also clear that there is a recognized distinction, in international trade and in industry, between steel in its basic forms and more advanced products made of steel. This is evidenced by the Paxton, Margolin, and Lovelett Affidavits accompanying plaintiff's motions and by the literature attached as exhibits, notably *The Making, Shaping and Treating of Steel* (10th Ed. 1985) published by the Association of Iron and Steel Engineers and the United States Steel Corporation; the *1985 Annual Statistical Report* published by the American Iron and Steel Institute ("AISI") and the AISI's *Steel Products Manual: Wire and Rods, Carbon Steel* (March 1984). The evidence on this point is overwhelming.

The government seizes on a description of how PC strand is used (in *The Making, Shaping and Treating of Steel* at pp. 1014–15,) to argue that the PC strand is known as "steel," but the following quotation shows that this argument is weak:

Steel wire or strand is tensioned and then concrete mix is poured around the steel. When the concrete has attained full strength, the wire or strand is released from its tensioning apparatus, and the tensile forces of the steel induce equal and opposite compressive forces on

---

**3.** The primary meaning of "commodity" is *any* article of commerce, i.e., a commercial *article* as opposed to a commercial *service.*

**4.** The text of § 2485 reads as follows:

No person shall be liable for damages, penalties, or other sanctions under the Federal Trade Commission Act [15 U.S.C. 41 *et seq.*] or the Antitrust Acts (as defined in section 4 of the Federal Trade Commission Act [15 U.S.C. 44]), or under any similar State law, on account of his negotiating, entering into, partici-

pating in, or implementing an arrangement providing for the voluntary limitation on exports of steel and steel products to the United States, or any modification or renewal of such an arrangement, if such arrangement or such modification or renewal—

(1) was undertaken prior to January 3, 1975, at the request of the Secretary of State or his delegate, and

(2) ceases to be effective not later than January 1, 1975.

the concrete. The bond between the concrete and steel continues to hold the steel in tension and the concrete in compression.

As the Court reads it, the description moves between "wire strand" and "steel" only as a natural variation in normal expository writing, and as a means of occasionally emphasizing the material attributes of the product. This does not begin to contradict the impressive evidence that in the industry "steel" means the basic forms of steel.

It is also worth mentioning that the Standard Industrial Classification Manual (1972) lists the steel industry and the PC strand industry in separate major groups. (Exhibit D to Margolin Affidavit.)

The distinction between steel in its basic forms and products made from steel also shows clearly in the structure of the Tariff Schedules of the United States, specifically in Schedule 6, which covers Metals and Metal Products. Part 2 of Schedule 6 covers "Metals, Their Alloys, And Their Basic Shapes and Forms." Subpart B of that part covers the basic shapes and forms of iron and steel, such as ingots, forgings, bars, wire rods, plates, sheets, strips, wire, angles and pipes. An entirely separate Part 3 of Schedule 6 covers "Metal Products" such as containers, strands, ropes, cables, fencing and screen. This is further evidence of a recognized distinction between "steel" as a material in basic forms and "steel products" as more advanced articles.

The government argues that the legislative history supports the inclusion of PC strand in the term "steel," but its specific historical references do not support this argument.

At first glance the government's reference to legislative history in H.R.Rep. 99–638, 99th Cong. 2d Sess. at 15, indicating that "steel" means "steel products," appears authentic. However, as plaintiff points out, this fragment of legislative history explains the views of the Committee on Foreign Affairs on a version of Section 3 of the Bill (H.R. 4868 99th Cong., 2d Sess. May 21, 1986) which was never considered by the House of Representatives. That committee version said that "... the following products of South Africa may not be imported to the United States: ... steel." It never passed into law due to a number of subsequent events. First, the Section 3 of another committee, the Committee on Ways and Means, was the one considered in the floor debate of H.R. 4868 under the rule governing that debate (House Resolution 478). That version was written as a very exact modification of the Tariff Schedules of the United States (TSUS) prohibiting the entry of "any steel product" (in a TSUS headnote) and naming, *inter alia*, the exact TSUS item number which covers wire strand. Second, H.R. 4868, containing the highly specific Section 3 of the Committee on Ways and Means, was transformed into a bill prohibiting *all foreign trade* with South Africa, except for imports of certain strategic materials and, in that form, was passed by the House. 132 Cong.Rec. H39007–3924. Third, the Senate did not debate the House bill, but focused on its own bill, S. 2701, which, in its original version, did not ban steel at all. S. 2701, 99th Cong., 2d Sess. § 311 (Aug. 6, 1986). *See* S.Rep. 99–370, U.S.Code Cong. & Admin.News 1986, p. 2334. Fourth, in debate on the Senate bill, the original version of Section 320 as we know it, was added without an explanation of the meaning of "steel." 132 Cong.Rec. S11815 (Aug. 15, 1986). Finally, at the close of all debate on S. 2701, the Senate text was substituted for the entire text of H.R. 4868 and it was passed by the Senate. *Id.* at S11879–80. Following that, without the calling of a conference committee, the House adopted H.R. 4868 as substituted by the Senate. *Id.* H.6769–6791.

At a minimum, this sequence of drastic transformations eliminates the Report of the House Committee on Foreign Affairs as a usable source of legislative history. "No reliance can be placed on a report which refers to language that was not included in the Act as it was finally adopted." *United States v. Lincoln Rochester Trust Co.,* 297 F.2d 891, 893 (2d Cir.1962). *See also, Unsecured Creditors' Committee v.*

*Walter E. Heller & Co.,* 768 F.2d 580, 585 f.n. 8 (4th Cir.1985).

A comparison between the language first suggested by the House Foreign Affairs Committee and the final language of the amendment later made in the Senate does not allow us to say that the Senate took its language or meaning from the former. The expressed intent of that original House committee to cover "steel products," cannot be forced all the way across intervening events and we cannot ignore the lack of a clear indication by the Senate that "steel" was being used in an expansive way. Silence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by history, even from bills which did not pass in prior years. This is particularly so for terms which, unlike "steel," are new or distinct usages. *See, T.W.A. v. Civil Aeronautics Board,* 336 U.S. 601, 604–607, 69 S.Ct. 756, 757–59, 93 L.Ed. 911 (1948). But to attribute an expansive meaning to an ordinary term in these circumstances requires a high degree of certainty as to the connection between the expansive past history and the final result. That is completely lacking here.

In its review of Senate legislative history, the Court has come across only one item worthy of more extended discussion. In defending a version of Section 320 which, though rejected, used the same language on the subject of steel as that which was ultimately adopted, Senator Byrd spoke as follows:

> The distinguished chairman of the Foreign Relations Committee [Senator Lugar] has characterized this amendment as protectionism in the guise of economic sanctions. I have to disagree. The effort here is to have an impact on the South African economy without destroying that economy. The sanctions in the Kennedy amendment banning imports of agricultural and *steel products* achieve that measured goal. South African steel exports to the United States account for only 5.3 percent of total South African *raw steel production.* If we end imports of *South African steel,* we say

that we are not prepared to be dependent upon that country for a *basic product—a product that is competing with American steel.* Incidentally I would like to see an end—or considerable reductions—in steel imports from other nations.

> I doubt that the five hundred thousand tons of steel we import annually from South Africa will make any difference to our own troubled steel industry, though I am not embarrassed to say that I hope it does help. Why should *American steel workers* compete with *South African steel* that is made at slave wages? Nonetheless, this is an issue of foreign policy, and the amendment makes a meritorious contribution on that basis.

132 Cong.Rec. S11681 (Aug. 14, 1986) (emphasis added).

This section does refer to "steel products" but it does not do so in a definitional way. It does so in passing and with a focus on rebutting the argument that the sanctions were a form of protectionism for the steel industry. Moreover, the single use of the term "steel products" to describe one of the objects of the amendment is weakened by further reference in the same remarks to South African "raw steel production," to unclear statistics, to dependency upon South Africa for "a basic product—a product that is competing with American steel," and to the desirability of an end to, or considerable reductions in "steel imports from other nations." This lacks the clarity which would be needed to conclude that the word "steel" was used in the next and final amendment to cover all steel products. It does not begin to overcome the dominant factors of plain meaning, commercial understanding, and statutory context which indicate otherwise. In short, it does not meet the Court's standard for legislative history firm enough to rely on against strong, basic interpretative considerations.

The weakness of this piece of legislative history is best demonstrated by comparing it to other remarks in the debate on the same Act, which show what type of history is reliable in these matters. Section 309 of

the Act bans the importation of "textiles" from South Africa. If that term was interpreted plainly, without legislative history, the same basic factors that led to the understanding of "steel" as a basic material would indicate that "textiles" were basic materials and did not include finished clothing apparel. However, in the case of "textiles" there exists the clear and unmistakeable indication of a broader legislative intent. When Senator Cranston introduced the amendment banning "textiles," he stated as follows:

> The amendment is thus designed to bar the import of any textiles *or textile products including finished clothing apparel* from the Republic of South Africa.
>
> \* \* \*. \* \* \*
>
> To give the exact figures-imports that do cover *all textile products, including finished clothing apparel* and imports of textiles, were the following, beginning in 1983:

132 Cong.Rec. S11633, 11634 (August 14, 1986) [emphasis supplied].

It is exactly this clarity of definition which is lacking in the legislative history of the term "steel." When the diffuse remarks on steel are compared with Senator Cranston's precision on "textiles" or with the precision of the earlier versions arising in the House which first plainly explained in a report that "steel" meant steel products and then, in proposed statutory language, named steel products by their exact TSUS Item number, the contrast is strong. The absence of a clear indication of an expansive legislative intention for the meaning of "steel" is decisive. The legislators obviously knew how to demonstrate expansive intentions for some provisions, either in reports, remarks accompanying amendments, or in the law itself. The noticeable lack of such a demonstration for Section 320 makes it conclusive that they had no intentions contrary to its plain meaning.

This leaves the government with a tenuous argument that the remarks of Senators Kennedy and Dodd at the time of the debate on the Senate floor (132 Cong.Rec. § 11810–§ 11824, August 15, 1986) referring to coordination on steel between the United States and other countries, combined with the *subsequent* fact that on October 1, 1986 the Candadian government implemented a ban on, *inter alia,* "wire products" somehow sheds light on the intentions of the Congress. This is much too convoluted, impossibly remote, and too indefinite to serve as any indication of legislative intention. It certainly cannot overcome the strong considerations of plain meaning, statutory context and general trade understanding which all indicate that "steel" means the basic forms of the material known as steel.

It has been said that "the plainer the language, the more convincing contrary legislative history must · be." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.1973) *cert. denied* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). Here we simply do not have the "clear contrary evidence of legislative intent" which it takes to overcome the basic general principles of statutory construction. *National Railroad Passenger Corp. v. National Association of Rail Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

 There is another element to the interpretation of this ban, namely, the principles of fundamental fairness by which we are more flexible in interpreting remedial legislation and less flexible in interpreting penal legislation. While no one would argue that the purpose of this ban is to further the most sacred objectives of human liberty, it must be recognized that the means used are severe and punitive in their effect on those subject to the ban. Moreover, there is a distinct provision for criminal penalties and imprisonment for violations found to be intentional (Section 603(b)(3)).[5] In this respect, there is a rela-

---

**5.** Section 603(b)(3):
any individual who willfully violates the provisions of this Act or any regulation, license,

or order issued to carry out this Act shall be fined not more than $50,000, or imprisoned not more than 10 years, or both

tion between this law and ordinary penal laws which seek to provide for the life and liberty of the whole of society by punishing reprehensible behavior. In short, sanctions are acts designed to punish and alter evil conduct. They should not be interpreted loosely. *United States v. Mersky*, 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1959), *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). The fundamental principle that penal laws should be strictly construed is a facet of the liberty which we prize so highly and which motivates this legislation. It should be honored in the interpretation of the Act as well.

This brings us to the end of the analysis of the term "steel" and its legislative history.

■ The government also defends the ban on PC strand as justified by the President's constitutional authority over foreign affairs as coupled or "pooled" with the enforcement authority given to him in Section 601 of this Act.

As noted earlier, Section 601 provides that the President shall issue such rules, regulations, licenses, and orders as are necessary to carry out the provisions of the Act. The Court finds this to be, on its face, a routine provision for enforcement of the Act and it does not invoke or suggest the exercise of any supplementary or superceding foreign policy powers.

First of all, the language used is language which conveys ordinary enforcement authority. The President is plainly and simply mandated to issue the orders needed to carry out the Act.

Secondly, the language is notably more limited than language in other trade legislation in which the President's foreign policy powers have been found to be operative. For example, in legislation regulating international trade in textiles, Section 204 of the Agriculture Act of 1956, as amended, 70

. . . .

6. The Court notes that the quoted provision is also another illustration of the point made earlier in the discussion of legislative history, name-

Stat. 188, 200, 7 U.S.C. § 1854 (1982) provided as follows:

> The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of an agricultural commodity or product manufactured therefrom or textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles, or textile products to carry out such agreements.[6]

The Court of Appeals for the Federal Circuit, in *American Association of Exporters & Importers v. United States*, 751 F.2d 1239, 1247 (Fed.Cir.1985) found that the preamble, stating that the President "may, whenever he determines such action appropriate" bestowed a broad grant of authority in the international field which covered not only the negotiation of international agreements but also the issuance of regulations to carry out the negotiated agreements. That broad language is notably absent here. Similarly, in the trade legislation which established the Generalized System of Preferences (GSP) (by which importations from certain developing countries are given duty-free treatment) Section 504(a) of the Trade Act of 1974, 19 U.S.C. § 2464(a) states as follows:

> The President may withdraw, suspend, or limit the application of the duty-free treatment accorded under section 2461 of this title with respect to any country; except that no rate of duty may be established in respect of any article pursuant to this section other than the rate which would apply but for this subchapter. In taking any action under this subsection, the President shall consider the factors set forth in sections 2461 and 2462(c) of this title.

ly, that Congress has consistently shown an awareness of the difference between basic materials and advanced products in these areas.

In *Florsheim Shoe v. United States*, 744 F.2d 787, 793 (Fed.Cir.1984) the Court found that this was an explicit grant of "plenary authority," which, together with clear legislative history, "strongly indicates that Congress granted the President broad discretion to take the described actions." Here we have neither the explicit statutory language nor a clear legislative history.

In certain interesting respects the factual circumstances of this case are similar to those in the case of *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622 (Ct.Cl.1964), *cert. denied* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965) and a comparison between the statutory language involved is very instructive. The *South Puerto Rico Sugar* case centered on legislation which controlled the international sugar trade of the United States by means of quotas on domestic and foreign sources of sugar, one of which was Cuba. The Act of July 6, 1960, Public Law 86–592, 74 Stat. 330, as an expression of dissatisfaction with the course of the Castro regime in Cuba, authorized the President to reduce the Cuban quota and to apportion the quota for "replacement" sugar among other countries which had been granted a quota, including the Dominican Republic. In 1960 relations between the United States and the Dominican Republic deteriorated after it was concluded that high officials of the Trujillo regime in the Dominican Republic had been involved in an attempt to assassinate President Betancourt of Venezuela and overthrow the Venezuelan government. The United States severed diplomatic relations with the Dominican Republic and the President asked Congress to change the sugar legislation to let other countries receive the quota allocation transferred to the Dominican Republic. Congress adjourned without doing so and the Secretary of Agriculture (who had suspended importation of the Dominican "replacement" sugar while Congress was debating the issue,) then, with the concurrence of the Secretary of State, amended his Sugar Regulation to allow a replacement quota for the Dominican Republic but, at the same time, imposed a fee on importation which effectively removed the price advantage of importing Dominican sugar.

The question for the Court was whether the President was authorized to impose this sanction in the form of entry fees in order to further the foreign policy of the United States. The Court answered this question in the affirmative, based on Section 3 of the Act of July 6, 1960, a portion of the law which provided for the reallocation of the Cuban quota as follows:

> For the purposes of meeting the requirements of consumers in the United States, the President is thereafter authorized to cause or permit to be brought or imported into or marketed in the United States, at such times and from such sources, including any country whose quota has been so reduced, and *subject to such terms and conditions as he deems appropriate under the prevailing circumstances,* a quantity of sugar, not in excess of the sum of any reductions in quotas made pursuant to this subsection.... [emphasis supplied]

At various points in its analysis the Court characterized this as "giving ... substantial discretion with respect to the importation of a critical commodity ... from competing countries ..." [334 F.2d at 630] "a wide grant of executive authority within the area left to the President ..." and "unqualified," carrying "the broadest connotations," and "of very large scope." [334 F.2d at 631] In the opinion of this Court none of the above can be said about the routine grant of authority in Section 601 of the Anti-Apartheid Act of 1986. For this reason this Court cannot find that the President was given the authority to introduce foreign policy considerations to alter the plain meaning of the act. This, of course, operates in two directions; when the word "steel" means basic steel forms, the President cannot add more advanced steel products. If the Act had covered "steel products" as well, the President could not ban some of those products and allow entry for others.

Finally, unlike the other laws discussed above, the legislative history of this Act does not show that, with respect to the ban

on steel, Congress was relying on, or contemplating, the necessity of having the ban adjusted or modified by the exercise of the President's foreign policy power. Considering the fact that this was legislation passed with an awareness that the President had said that sanctions against South Africa would be "a historic act of folly," [7] and with knowledge that a veto by the President was likely, it would be disingenuous to say that Congress was concerned to bestow upon him unusually extensive discretion in its enforcement. As noted earlier, this legislation was vetoed by the President and then was passed over his veto. With respect to the importations being banned, the Court concludes that this Act confined the President to a normal executive and ministerial role.

For the reasons expressed above, the Court finds and declares that PC strand is not "steel" within the meaning of Section 320 of the Comprehensive Anti-Apartheid Act of 1986 and including it in the ban on "steel" is *ultra vires*, arbitrary and capricious. This conclusion requires the denial of the government's cross-motion for summary judgment and leads to consideration of plaintiff's motion for injunctive relief.

■ The Court finds that all the factors required for the granting of injunctive relief are present here. First, plaintiff's success on the merits has already been determined by the Court. Second, the evidence introduced by plaintiff, (the details of which are confidential business information which may be disclosed only under a protective order) proves that the inclusion of PC strand in the ban on the importation of steel from South Africa, is causing irreparable injury to plaintiff by preventing the importation of PC strand from a source which accounts for the majority of its sales and a high proportion of its profits. Inclusion in the ban is causing loss of sales currently contracted for, the loss of customers, the loss of future sales, and the deterioration of its business relationships. Third, the Court finds that the harm to plaintiff if the injunction is not granted outweighs the harm to defendant, which is not really harm at all, but a restraint on *ultra vires* action. Finally, the Court finds that the public interest will best be served by the granting of injunctive relief as a demonstration of the supremacy of Congressional intention in this matter and the importance of enforcing the Act in lawful compliance with its specific terms.

For the reasons given above it is hereby ORDERED

That plaintiff's motion for declaratory judgment is granted, and it is

DECLARED and held that the inclusion of PC strand in the products banned under Section 320 of the Comprehensive Anti-Apartheid Act of 1986 is unlawful, and it is further

ORDERED that defendant is permanently enjoined from prohibiting the importation of PC strand from South Africa under Section 320 of the Comprehensive Anti-Apartheid Act of 1986, and it is further

ORDERED that defendant's motion for summary judgment and all other pending motions are hereby denied.

---

7. *See,* 132 Cong.Rec. S11639 (daily ed. Aug. 14, 1986) (statement of Sen. Wallop).