SPRINGFIELD INDUSTRIES CORPO-
RATION, Plaintiff–Appellee,

v.

The UNITED STATES,
Defendant–Appellant.

No. 87–1469.

United States Court of Appeals,
Federal Circuit.

March 29, 1988.

John B. Rehm, Busby, Rehm and Leon-
ard, P.C., Washington, D.C., argued for
plaintiff-appellee. With him on the brief
were Jonathan Hemenway Glazier and
Munford Page Hall, II, Washington, D.C.

Douglas Letter, Dept. of Justice, Wash-
ington, D.C., argued for defendant-appel-
lant. With him on the brief were Richard
K. Willard, Asst. Atty. Gen., David M. Co-
hen, Washington, D.C., Joseph I. Liebman
and Michael P. Maxwell, New York City.

Before MARKEY, Chief Judge,
RICH, Circuit Judge, and MILLER,
Senior Circuit Judge.

JACK R. MILLER, Senior Circuit
Judge.

As related by the Court of International
Trade, 663 F.Supp. 128 (CIT 1987), from
which this appeal is taken:

This is an action brought under 28
U.S.C. § 1581(i) by an importer of wire
strand seeking injunctive relief and a de-
claratory judgment that the product it
imports from South Africa is not "steel",
barred from importation under Section
320 of the Anti-Apartheid Act of 1986, as
amended, 22 U.S.C. § 5070 (West Supp.
1987).

. . . .

The product in question is known as
prestressed concrete strand or PC
strand. It is composed of six steel wires
wrapped around a seventh steel wire of a
slightly larger diameter. The steel wires
of which it is made are manufactured
from steel rod, which is one of the basic
forms in which steel is produced by a
steel mill.

PC strand is used to strengthen con-
crete for construction purposes. It is
generally used by placing it under ten-
sion, pouring the concrete around it, let-
ting the concrete set, and then releasing
the tension, thereby compressing and
strengthening the concrete in which it is
embedded. It can also be inserted in the
concrete without tension and placed un-
der tension later.

The following sequence of events led
to the ban on the importation of this
product.

On October 2, 1986, Congress passed
the Comprehensive Anti–Apartheid Act
of 1986, Public Law 99–440 [the "Act"]
over the President's veto.... The Act
contains a Title III entitled, "Measures
By The United States To Undermine

Apartheid." In Title III, Section 320, states as follows:

> Notwithstanding any other provision of law, no iron or steel produced in South Africa may be imported into the United States, except [not here applicable]. . . .

Section 601 of the Act, the first section of Title VI, covering "Enforcement and Administrative Provisions," provides that "the President shall issue such rules, regulations, licenses and orders as are necessary to carry out the provisions of this Act. . . .".

On October 27, 1986, in Section 3 of Executive Order 12571 . . . the President made the Secretary of the Treasury responsible for implementing Section 320.

On November 19, 1986, the Department of the Treasury, through its Office of Foreign Assets Control, published final rules which it called "South African Transaction Regulations" . . . which stated as follows:

> Guidelines are being published today in a separate notice related to this final rule delineating the products subject to the importation bans affecting agriculture, articles suitable for human consumption, iron ore, iron, and steel. The U.S. Customs Service will determine whether particular merchandise is subject to exclusion pursuant to these guidelines.

On that same date the Department of the Treasury published what it called a notice of interpretation entitled "South African Transactions Regulations—product Guidelines." . . . The Guidelines in relevant part, stated, as follows:

> This notice is published in conjunction with that final rule [the aforementioned South African Transaction Regulations] to inform interested persons of the guidelines to be employed by the U.S. Customs Service in determining which products are agricultural commodities, articles suitable for human consumption, iron ore, iron, or steel within the meaning of the Act.

The Guidelines then listed 15 categories as included within the ban of Section 320, by reference to the Item Numbers used in the Tariff Schedules of the United States. . . .[1]

663 F.Supp. at 129–30 (footnote omitted).

Both parties recognize that there is a dearth of legislative history to turn to in determining the meaning of "steel" for purposes of Section 320 of the Act. However, ignoring the presumption of correctness of the agency's action, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Court of International Trade relies upon "strong, basic interpretative considerations" such as "plain meaning, statutory context and general trade understanding which all indicate that 'steel' means the basic forms of the material known as steel." The Court of International Trade concludes that "absence of a clear indication of an expansive legislative intention for the meaning of 'steel' is decisive." [2]

On the other hand, the Government persuasively points out that Congress explicitly delegated to the Executive the authority to promulgate such orders and regulations "as are necessary" to implement the Anti–Apartheid Act, 22 U.S.C. § 5111 (Supp. IV 1986); that the Supreme Court has made clear that when the statutory language does not dispose of a particular issue and there is an explicit or implicit delegation to the Executive, the courts must accept the agency interpretation of the law if that interpretation is merely a permissible one, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 865–66, 104 S.Ct. 2778, 2781–83, 2792–93, 81 L.Ed.2d 694 (1984); and that as long as the Executive interpretation of the statute is not manifestly contrary to

---

**1.** At this point it should be noted that the Government, correctly, we believe, states that Springfield is mistaken in relying on the TSUS; that the TSUS are not controlling in defining "steel" in a social policy/foreign relations statute; and that Springfield has failed to provide "even the slightest indication" that distinctions in the TSUS were intended by Congress to govern the Anti–Apartheid Act.

**2.** Such a "clear indication" could vary with the eyes of the beholder.

the terms of the statute, a court must accept it, even if that interpretation is not what the court itself would otherwise have given it. This "rule of deference" is particularly strong when, as here, not only is there an interpretation of the statute by the officers or agency charged with its administration, but the agency action is in the foreign affairs arena. *Regan v. Wald,* 468 U.S. 222, 242, 104 S.Ct. 3026, 3037, 82 L.Ed.2d 171 (1984); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Duracell, Inc. v. U.S. Int'l Trade Comm'n,* 778 F.2d 1578, 1582 (Fed.Cir. 1985).[3]

■ Accordingly, we hold that the Court of International Trade's conclusion, that banning the importation of PC strand from South Africa was *ultra vires,* was error.[4]

■ As to Springfield's argument that other steel products should also have been included in the ban on imports from South Africa, the agency may properly implement a statutory scheme a step at a time. *See Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970). Also, it has not been shown that banning such other products would further the Congressional purpose.

Accordingly, we hold further that the Government's ban on imports of PC strand from South Africa was not arbitrary or capricious.

In view of the foregoing, the Court of International Trade's judgment is reversed, the injunction is dissolved, and judgment is entered in favor of the Government.

REVERSED.

---

3. We note the Government's argument that the Treasury Department Office of Foreign Assets Control attempted to coordinate United States policy with respect to the embargo on South African steel with the policies adopted by Canada, our largest trading partner; that after the Anti–Apartheid Act was passed, but before the Treasury Department regulations were published, Canada included wire products within those items from South Africa whose imports to Canada are banned.

4. We further note that the Executive possesses independent constitutional authority in the area of foreign affairs in addition to his authority under the Act. *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936).