**Slip Op. 01-125**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

```
_____
                                    :
PEER BEARING COMPANY,               :
                                    :
        Plaintiff and               :
        Defendant-Intervenor,       :
                                    :
        v.                          :
                                    :
UNITED STATES,                      :
                                    :
        Defendant,                  :    Consolidated
                                    :    Court No. 97-03-00419
THE TIMKEN COMPANY,                 :
                                    :
        Defendant-Intervenor and    :
        Plaintiff,                  :
                                    :
        and                         :
                                    :
L & S BEARING COMPANY;              :
SHANGHAI GENERAL BEARING CO., LTD.  :
                                    :
        Defendant-Intervenors.      :
_____ :
```

This consolidated action concerns the claims raised by Peer Bearing Company ("Peer Bearing"), a plaintiff, and The Timken Company ("Timken"), a plaintiff and a defendant-intervenor. Peer Bearing and Timken move pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u>, 62 Fed. Reg. 6189 (Feb. 11, 1997).

Peer Bearing asserts that Commerce erred in: (1) selecting an allegedly punitive dumping margin for certain transactions of Peer Bearing on the basis of best information available ("BIA") to Commerce; (2) failing to issue a separate rate determination for East Sea Bearing Company Ltd. ("East Sea Bearing"); and (3) committing a clerical error in applying BIA to certain models for

which factors of production ("FOPs") were available.

Timken claims that Commerce erred in: (1) selecting Indonesian, rather than Indian, import statistics for valuing bearing-quality steel used to manufacture tapered roller bearings ("TRBs") cups and cones; (2) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining foreign market value ("FMV"); (3) failing to use Indian material and labor costs data in the calculation of overhead, SG&A and profit rates; (4) adjusting FMV by the exporter's sales price ("ESP"); (5) failing to adjust United States price for marine insurance costs based on value rather than weight; and (6) revoking the antidumping duty order with respect to Shanghai General Bearing Co., Ltd. ("Shanghai General"), a defendant-intervenor in this action.

**Held:** Peer Bearing's motion for judgment on the agency record is granted in part and denied in part. Timken's motion for judgment on the agency record is granted in part and denied in part. Case is remanded to Commerce to: (1) correct the clerical error resulting from the application of BIA to certain models for which FOPs were available; (2) redetermine direct labor costs on the basis of SKF India's data on labor (supplemented by facts otherwise available only to the extent necessitated by the insufficiency, if any, of SKF India's data currently on the record); and (3) determine marine insurance in a manner related to the value and the risk of transporting TRBs. Commerce's final determination is affirmed in all other respects.

[Peer Bearing's motion for judgment on the agency record is granted in part and denied in part. Timken's motion for judgment on the agency record is granted in part and denied in part. Case remanded.]

Dated: October 25, 2001

Arent Fox Kintner Plotkin & Kahn, PLLC (John M. Gurley, Peter L. Sultan, Jinhee K. Wilde and Matthew J. McConkey) for Peer Bearing Company, plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); of counsel: Rina Goldenberg, Office of the Chief Counsel for Import

Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer and Charles A. St. Charles) for The Timken Company, plaintiff and defendant-intervenor.

Cohen Darnell & Cohen, P.L.L.C. (Mark A. Cohen) for L & S Bearing Company, defendant-intervenor.[1]

Reed Smith Shaw & McClay (James K. Kearney) for Shanghai General Bearing Co., Ltd., defendant-intervenor.


## OPINION

**TSOUCALAS, Senior Judge:**      This consolidated action concerns the claims raised by Peer Bearing Company ("Peer Bearing"), a plaintiff, and The Timken Company ("Timken"), a plaintiff and a defendant-intervenor.  Peer Bearing and Timken move pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 62 Fed. Reg. 6189 (Feb. 11, 1997).

---

[1] L & S Bearing Company has intervened in this action but did not file a motion for judgment upon the agency record and supporting brief.

Peer Bearing asserts that Commerce erred in: (1) selecting an allegedly punitive dumping margin for certain transactions of Peer Bearing on the basis of best information available ("BIA") to Commerce; (2) failing to issue a separate rate determination for East Sea Bearing Company Ltd. ("East Sea Bearing"); and (3) committing a clerical error in applying BIA to certain models for which factors of production ("FOPs") were available.

Timken claims that Commerce erred in: (1) selecting Indonesian, rather than Indian, import statistics for valuing bearing-quality steel used to manufacture tapered roller bearings ("TRBs") cups and cones; (2) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining foreign market value ("FMV"); (3) failing to use Indian material and labor costs data in the calculation of overhead, SG&A and profit rates; (4) adjusting FMV by the exporter's sales price ("ESP"); (5) failing to adjust United States price for marine insurance costs based on value rather than weight; and (6) revoking the antidumping duty order with respect to Shanghai General Bearing Co., Ltd. ("Shanghai General"), a defendant-intervenor in this action.

**BACKGROUND**

The administrative review at issue covers the period of review from June 1, 1993, through May 31, 1994.[2]  Commerce published the preliminary results of the subject review on September 26, 1995. See  Preliminary Results of Antidumping Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Preliminary Results"), 60 Fed. Reg. 49,572.  On Feb. 11, 1997, Commerce published the Final Results at issue.  See 62 Fed. Reg. 6189.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

**STANDARD OF REVIEW**

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law .

_____

[2]  Since the administrative review at issue was initiated before January 1, 1995, the applicable law is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

. . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).


## I.   Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 487-88)).


## II.   Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application

of the antidumping statute is "in accordance with law," the Court

must undertake the two-step analysis prescribed by Chevron U.S.A.

Inc. v. Natural Resources Defense Council, Inc. ("Chevron"), 467

U.S. 837 (1984). Under the first step, the Court reviews

Commerce's construction of a statutory provision to determine

whether "Congress has directly spoken to the precise question at

issue." Id. at 842. "To ascertain whether Congress had an

intention on the precise question at issue, [the Court] employ[s]

the 'traditional tools of statutory construction.'" Timex V.I.,

Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing

Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to

be used is the statute's text, giving it its plain meaning.

Because a statute's text is Congress's final expression of its

intent, if the text answers the question, that is the end of the

matter." Id. (citations omitted). Beyond the statute's text, the

tools of statutory construction "include the statute's structure,

canons of statutory construction, and legislative history." Id.

(citations omitted); but see Floral Trade Council v. United States,

23 CIT ___, ___ n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that

"[n]ot all rules of statutory construction rise to the level of a

canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court

determines that the statute is silent or ambiguous with respect to

the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States Dep't of Commerce, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT ___, ___, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

I.   COMMERCE'S USE OF BEST INFORMATION AVAILABLE

   A.   Background

   During the period of review, Peer Bearing, through Chin Jun
Industrial Ltd. ("Chin Jun"), a reseller of TRBs and an affiliate
of Peer Bearing, made purchases of the merchandise at issue from
various exporters from the People's Republic of China ("PRC"). See
Pl.'s Mem. P. & A. Supp. Pl.'s Rule 56.2 Mot. J. Agency R. ("Peer
Bearing's Mem.") at 2.   Peer Bearing, in turn, resold the
merchandise in the United States and in third-country markets. See
id.

   Because the PRC is a nonmarket economy, Commerce, acting under
the mandate of 19 U.S.C. § 1677b(c) (1988), calculated FMV on the
basis of FOPs data. See id. at 3.  Commerce sought and obtained
FOPs data for some but not all of the exporters utilized by Chin
Jun.   See id.  Consequently, Commerce applied BIA to the United
States sales of the merchandise on which FOPs data was unavailable.
See id.  BIA was based on the higher of: (1) the highest of the
rates found for Peer Bearing in the less than fair value ("LTFV")
investigations in the prior reviews; or (2) the highest margin
calculated for any respondent in the review at issue. See Final
Results, 62 Fed. Reg. at 6214. Applying this methodology, Commerce
determined the dumping margin for the merchandise on which FOPs

data was unavailable, the rate equal to the rate determined for another respondent in the review.  See id.

   **B.    Contentions of the Parties**

Peer Bearing contends that Commerce's reliance on BIA was improper because the missing data was beyond the control of Peer Bearing.  See Peer Bearing's Mem. at 5-6 (citing Usinor Sacilor v. United States, 18 CIT 1155, 1162, 872 F. Supp. 1000, 1007 (1994)). Additionally, Peer Bearing argues that Commerce erred in using BIA that was "punitive" and ignoring: (1) Peer Bearing's cooperation with Commerce's investigative measures, see id. at 4, 7 (citing Final Results, 62 Fed. Reg. at 6210-11); and (2) the fact that the missing data constituted but a minor gap in the record Commerce compiled.  See Pl.'s Reply Resp. Brs. Def. and Def.-Intervenor ("Peer Bearing's Reply") at 2-4.

Commerce asserts that the language of 19 U.S.C. § 1677e(c) allows Commerce to rely on BIA in a situation as the one in the case at bar.  See Def.'s Mem. Opp'n Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 11-12.  Commerce also maintains that the BIA used did not amount to "punitive" BIA because: (1) the BIA used was a "partial" BIA, see id. at 14-16; and (2) Commerce did not reject "'low margin information in favor of high margin information that was demonstrably less probative of current conditions.'"  Id. at 16

(quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990)).

Timken supports Commerce's position noting that: (1) Commerce's reliance on BIA was consistent with Commerce's practice as scrutinized by courts' interpretations of the relative statutory provision; and (2) Commerce's selection of partial BIA did not amount to a punitive action. See Timken's Opp'n Pl.'s Mot. J. Agency R. ("Timken's Opp'n") at 8-15.

### C.    Analysis

#### 1.    Commerce's Reliance on BIA

In conducting an antidumping investigation, Commerce is charged with calculating margins as accurately as possible. See Rhone Poulenc, 899 F.2d at 1191. In order to fulfill this mandate, Commerce relies, wherever possible, on the information submitted by the respondents. Conversely, where the necessary information is not obtained from respondents, Commerce resorts to the BIA "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation . . . ." 19 U.S.C. § 1677e(c) (1988) (emphasis supplied).

The legislative goal behind Commerce's right to use facts

available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ." National Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994) (citation omitted).  If a party, however,

> promptly . . . notifies [Commerce] that such party is unable to submit the information requested in the requested form and manner [and provides Commerce] with a full explanation and suggest[s] alternative forms in which such party is able to submit the information, [Commerce] shall consider the ability of the . . . party to submit the information in the requested form and manner and may modify [Commerce's] requirements . . . .

19 U.S.C. § 1677m(c)(1) (1994) (a later codification of Commerce's practice at the time of the review, emphasis supplied).

Consequently, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of BIA.  See generally, Olympic Adhesives, Inc. v. United States, 899 F.2d 1565 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion with regard to the use of facts available but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).

In addition, a regulation implementing 19 U.S.C. § 1677e(c), 19 C.F.R. § 353.37 (1994), allows Commerce to resort either to total or to partial BIA.  See National Steel, 18 CIT at 1131, 870

F. Supp. at 1135; see also Christensen v. Harris County, 529 U.S. 576, 588 (2000).  Commerce applies total BIA when a respondent has failed to submit information or submitted data so flawed that the response as a whole is rendered unreliable.[3]  See Persico Pizzamiglio, S.A. v. United States, 18 CIT 299, 305 (1994); Rhone Poulenc, Inc. v. United States, 13 CIT 218, 224, 710 F. Supp. 341, 346 (1989).  Conversely, "Commerce applies partial BIA when only part of the submitted information is deficient."  National Steel, 18 CIT at 1131, 870 F. Supp. at 1135.  "The adversity of the information used as partial BIA depends on the level of sufficiency of the information provided" but not on the respondent's level of cooperation.  Id.

In this case, Commerce chose to apply partial BIA to Peer Bearing's sales of the merchandise for which the requested information was deficient because the deficiency affected Commerce's ability to make the determination only to a limited extent.  See Final Results, 62 Fed. Reg. at 6210-11.  Commerce's general decision to resort to partial BIA, therefore, was entirely justified under the mandate of the applicable statute and regulation, see 19 U.S.C. § 1677m(c)(1); 19 C.F.R. § 353.37, and

---

[3] "For total BIA, the margins used in determining the overall rate are derived from sources other than the data submitted by the respondent in the final investigation."  National Steel, 18 CIT at 1131, 870 F. Supp. at 1135.

Peer Bearing's substantial level of cooperation does not render Commerce's decision invalid in view of: (1) the discretion specifically afforded to Commerce by the language of 19 U.S.C. § 1677m(c)(1), particularly, in light of National Steel, 18 CIT at 1131, 870 F. Supp. at 1135; and (2) the level of deference this Court owes to an agency determination. See American Spring Wire, 8 CIT at 22, 590 F. Supp. at 1276 ("The court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo,'" quotations omitted).

### 2.    Commerce's Use of Allegedly Punitive BIA

Peer Bearing contests the assignment of the particular BIA rate that Commerce chose. See Pl.'s Mem. at 4. Peer Bearing asserts that the particular rate is "punitive," see id., and requests the Court to direct Commerce to assign a "neutral" BIA rate. See id. at 9-10.

First, the regulation implemented under the statute provides that Commerce is entitled to resort to BIA if Commerce "(1) [d]oes not receive a complete, accurate, and timely response to [its] request for factual information; or (2) [i]s unable to verify, within the time specified, the accuracy and completeness of the

factual information submitted." 19 C.F.R. § 353.37(a). The language of § 353.37(a) is a practical implementation of the statutory mandate that serves as a mechanism preventing the impediments to investigation proscribed by the statute. See 19 U.S.C. § 1677e(b) (1988). Thus, Commerce acted fully in accordance with the controlling provisions.

Second, the Court is not convinced that the particular rate chosen by Commerce is a punitive one. "Commerce's use of uncooperative BIA does not necessarily make the resulting rate 'punitive' in nature . . . ." Transcom, Inc. v. United States, 24 CIT ___, ___, 121 F. Supp. 2d 690, 705 (2000). "In order for the agency's application of the best information rule to be properly characterized as 'punitive,' the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions."[4]   Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (citation omitted, emphasis supplied). Peer Bearing's expectations are beside the point. "[T]he expectations of the [United States] importer are irrelevant in setting a dumping

_____

[4] Furthermore, the fact that a respondent cooperated during the review period does not, by itself, require Commerce to select a non-adverse or neutral BIA rate. See Allied-Signal Aerospace Co. v. United States, 28 F.3d 1188 (Fed. Cir. 1994) (affirming Commerce's selection of 65.13 and 17.31 percent cooperative-respondent rates), cert. denied, 513 U.S. 1077 (1995).

margin." Union Camp Corp. v. United States, 22 CIT 267, 279 n.7,
8 F. Supp. 2d 842, 852 n.7 (1998).

Therefore, Commerce was free to choose a rate Commerce
determined to be appropriate because the proposed low margin
information was not "demonstrably [more] probative of current
conditions." Final Results, 62 Fed. Reg. at 6211.

## II. SEPARATE RATE FOR EAST SEA BEARING COMPANY LTD.

### A. Background

East Sea Bearing, a Chinese reseller, purchased TRBs from
Chinese manufacturers and then resold that merchandise to Peer
Bearing. See Peer Bearing's Mem. at 3. In the review at issue,
East Sea Bearing was neither named as a respondent nor subject to
any request for review of its entries. See id. Nonetheless, one
week prior to publication of the Preliminary Results, East Sea
Bearing submitted a voluntary response to Commerce's separate-rates
questionnaire.[5] See Peer Bearing's Reply at 11.

---

[5] In this submission, East Sea Bearing argued that its exports
should be liquidated at the entered value because it was not
related to any of the other parties in the review. East Sea
Bearing then submitted a case brief on November 6, 1995, claiming
that: (1) East Sea Bearing should have been treated like Xiangfan
International Trade Corporation, a voluntary respondent determined
to be entitled to a separate rate; and (2) that East Sea Bearing's
entries should have been liquidated at the entered rate. See Peer
Bearing's Mem. at 4, 10-11; Peer Bearing's Reply at 11-13.

**B.    Contentions of the Parties**

Peer Bearing contends that Commerce's decision not to issue a separate rate for East Sea Bearing was unsupported by substantial evidence and not in accordance with law.  See Peer Bearing's Reply at 11-13.

Commerce maintains that it acted reasonably in declining to assign a separate rate to East Sea Bearing.  See Def.'s Mem. at 18-20.  Timken supports the conclusion reached by Commerce and points out that at a later review Commerce assigned a separate rate to East Sea Bearing, thereby making any amendment to the determination at issue obsolete.[6]

**C.    Analysis**

Commerce's antidumping regulations provide that factual information solicited through the means of questionnaires must be submitted by the deadline stated in such questionnaires.  See 19 C.F.R. § 353.31(b)(2) (1994).  Furthermore, "questionnaire responses in administrative reviews must be submitted not later

---

[6] While Timken's argument may have some merit as far as the practical outcome of the issue is concerned, the Court disagrees with Timken's bold assertion that an issue that may constitute a legal wrong necessarily becomes moot merely as a result of a later unrelated action that incidentally, and possibly temporarily, corrects the alleged wrong.  See generally, Weinstein v. Bradford, 423 U.S. 147 (1975), compare De Funis v. Odegaard, 416 U.S. 312 (1974).

than 60 days after the date of receipt of the questionnaire." 19

C.F.R. § 353.31(b)(4) (1994).

Commerce's questionnaires pertinent to the matter were issued

between December 5 and 9, 1994, and bore a submission deadline of

January 3, 1995. See Def.'s Mem. at 18-19. East Sea Bearing's

response, submitted on September 18, 1995, was received "much too

late for timely consideration by Commerce in the relevant review

period.[7] Even if Commerce wanted to be generous with the imposed

deadline for such responses, Commerce regulations allow for no more

than 60 days to respond." Id. at 19. Consequently, Commerce was

correct in declining to consider East Sea Bearing's submission.

Under the governing regulatory regime, the mere fact that Commerce

assigned a separate rate to another volunteer respondent, Xiangfan

---

[7] Peer Bearing points out that: (1) East Sea Bearing's very
first submission was filed on March 30, 1995; and (2) East Sea
Bearing cannot be subject to a set deadline because of East Sea
Bearing's voluntary status. See Peer Bearing's Reply at 12.
Additionally, Peer Bearing asserts that "Commerce orally indicated
. . . that parties could file a voluntary response to the . . .
questionnaire" any time before the Preliminary Results were issued.
Id. The arguments leave this Court unconvinced. First, a January
deadline renders a submission filed in March as defective as that
filed in September. Second, the Court fails to fancy an operable
review scheme where any party is allowed to provide an agency with
information at the party's leisure and yet can expect the agency to
review the information timely and issue a binding determination.
Finally, a mere allegation of one party about oral assurances made
by an agency creates no obligation for the agency to follow a
particular mode of action, it serves even less as a basis for a
legal remedy or a court review. Compare United States v. Mead
Corp., 121 S. Ct. 2164 (2001).

International Trade Corporation, that entered its response within the allotted time period, does not obligate Commerce to assign a separate antidumping rate to East Sea Bearing.

### III. Commerce's Ministerial Error

In the Preliminary Results, Commerce applied BIA to several models of Peer Bearing's merchandise on the assumption that FOPs data had not been provided for these models, when, in fact, it had been provided. See 60 Fed. Reg. 49,572. Being alerted to the issue by Peer Bearing, in the Final Results Commerce agreed to correct these clerical errors. See 62 Fed. Reg. at 6211. Yet, Commerce's calculations in the Final Results failed to reflect the corrections. See id. Commerce seeks to have the case remanded for corrections and Peer Bearing concurs with Commerce's position. Therefore, the issue is remanded to Commerce to adjust the calculations accordingly.

### IV.  COMMERCE'S SELECTION OF INDONESIAN IMPORT STATISTICS AS A SURROGATE VALUE FOR RAW-MATERIAL COSTS OF STEEL USED BY CHINESE PRODUCERS

#### A.    Background

Antidumping margins are the difference between FMV and United States price of the merchandise. When the merchandise is produced in a nonmarket economy country ("NME"), such as the PRC, Commerce constructs FMV pursuant to § 1677b(c), which provides that

the valuation of the factors of production shall be based on <u>the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]</u>.

19 U.S.C. § 1677b(c)(1) (1988) (emphasis supplied).

The statute does not define the phrase "best available information," it only provides that

> [Commerce], in valuing factors of production[,] . . . shall utilize, to the extent possible, the prices or costs of factors of production in <u>one or more market economy countries</u> that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1988) (emphasis supplied).

Thus, the statute grants Commerce broad discretion to determine the "best available information" in a reasonable manner on a case-by-case basis. <u>See</u> <u>Lasko Metal Prods., Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (noting that the statute "simply does not say--anywhere--that the factors of production must be ascertained in a single fashion.") Consequently, Commerce values as many FOPs as possible using information obtained from the "primary" surrogate country, that is, the country that Commerce considers to be most comparable in economic terms to the NME country being investigated, and that also produces merchandise comparable to the subject merchandise. <u>See, e.g.</u>, <u>Tianjin Mach. Import & Export Corp. v. United States</u> ("<u>Tianjin</u>"), 16 CIT 931, 940-41, 806

F. Supp. 1008, 1017-18 (1992); Timken Co. v. United States, 16 CIT 142, 143-44, 788 F. Supp. 1216, 1218 (1992).  Additionally, if Commerce determines that suitable values cannot be obtained from the data of the primary surrogate country, Commerce resorts to the data from the second, and sometimes the third, surrogate.  See, e.g., Timken Co. V. United States, 2001 Ct. Intl. Trade LEXIS 100 at *30-38, Slip Op. 01-96 at 24-30 (CIT Aug. 9, 2001); Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China, 59 Fed. Reg. 55,625, 55,629 (Nov. 8, 1994); Final Determination of Sales at Less Than Fair Value: Certain Helical Spring Lock Washers From the People's Republic of China ("Helical Spring Lock Washers"), 58 Fed. Reg. 48,833, 48,835 (Sept. 20, 1993).

During this review, Commerce initially chose India as the primary surrogate country to value all FOPs, see Preliminary Results, 60 Fed. Reg. at 49,574, because Commerce believed Indian import statistics constituted the best information available for valuing the merchandise at issue.  See id. at 49,575.  After considering comments that questioned the use of Indian import statistics, Commerce re-examined the matter.  See Final Results, 62 Fed. Reg. at 6195.

Upon examining the Indian import statistics, Commerce found that bearing-quality steel used to manufacture the merchandise at issue was most likely contained in category 7228.30 comprised of several eight-digit sub-categories. See id. After elimination of those specific eight-digit sub-categories that did not cover the steel used to produce the merchandise at issue, Commerce was left to consider the only remaining sub-category, 7228.30.19, designated as "other" type of steel. See id. Commerce, however, had no information concerning this "other" type of steel and whether this category specifically isolated the steel used to produce the merchandise at issue. See id.

Examining the data further, Commerce observed that the average value of steel in this "other" type of steel sub-category was greater than the average value of steel in category 7228.30. In addition, Commerce compared the average value of general category 7228.30 to pertinent import data regarding the United States and found that, during the period of review, the average value of steel included in Indian category 7228.30 was significantly higher than the average value of the analogous steel imported into the United States. See id. Consequently, Commerce: (1) determined that the Indian import data that it used in the Preliminary Results, 60 Fed. Reg. at 49,574, were not reliable, see Final Results, 62 Fed. Reg. at 6195-96; and (2) concluded that the import data from a secondary

surrogate, Indonesia, a producer of merchandise comparable to that

at issue, would constitute the best information available to value

steel used to produce the merchandise at issue.  See id. at 6196.

Commerce stated that

> unlike the Indian data, the Indonesian six-digit category
> 7228.30 closely approximates the value of [United States]
> imports of [steel of analogous quality] . . . .  Thus,
> [Commerce] . . . determined that Indonesian category
> 7228.30, which is the narrowest category [Commerce] can
> determine [that] would contain [steel of analogous
> quality], is the best available information for valuing
> steel used to produce [the merchandise at issue,]
> [a]lthough Indonesia is not the first-choice surrogate
> country in this review . . . .

Id.


### B.    Contentions of the Parties

Timken, acting in its capacity as plaintiff, asserts that: (1)

Commerce's refusal to use Indian data was unjustified, see Timken's

Mem. P. & A. Supp. Mot. J. Agency R. ("Timken's Mem.") at 17-31; (2)

Commerce's reliance on Indonesian data and the United States

benchmark was unreasonable, see id. at 20-26; and (3) Commerce's

decision to use Indonesian data for the first time in the Final

Results after indicating in the Preliminary Results that Indian data

would be used constituted an unjustified change in methodology and

deprived Timken of the opportunity to comment on the change and to provide supplemental information.[8]  See id. at 29.

Commerce maintains that its determination and the underlying analyses were reasonable, in accord with the mandate of 19 U.S.C. § 1677b(c) (1988) and the level of discretion afforded to Commerce by Chevron, 467 U.S. 837.  See Def.'s Mem. at 21-34.  Specifically, Commerce points out that:  (1) Commerce properly relied on FOPs from a different surrogate source; (2) Commerce reasonably concluded that Indonesia could serve as a surrogate country for the purposes of import valuation of the merchandise at issue; (3) Commerce's decision to reject Indian import values was supported by substantial evidence; and (4) Commerce reasonably compared Indian import values to those of the United States.  See id.

Peer Bearing and Shanghai General support Commerce's position and point out that: (1) Commerce may choose among available alternatives so long as the choice is reasonable and based on

---

[8]  Timken notes that Commerce failed initially to place evidence on the record of import statistics for Indonesia, the United States, or the European Union, although Timken recognizes that these documents were publically available.  See Timken Mem. at 9 n.2.  On February 12, 1998, Commerce supplemented the record to include these documents but because: (1) Commerce is currently unable to present the documents about the European Union data to the Court; and (2) Commerce waives its reliance on that data, see Def.'s Mem. at 29 n.15, the Court shall not consider the European Union data as evidence of the propriety of Commerce's determination.

substantial record evidence; (2) Commerce reasonably considered the United States import statistics as a benchmark to determine the reliability of Indian import statistics; and (3) Commerce was justified in using Indonesian data for the first time in the Final Results.  See Peer Bearing's Resp. Pl. Timken's Mot. J. Agency R. of Aug. 28, 1998 ("Peer Bearing's Resp. of Aug. 28") at 6-13; Shanghai General's Mem. P. & A. Opp'n Pl.'s Mot. J. Agency R. ("Shanghai General's Mem.") at 5-15.

## C. Analysis

### 1. Commerce's Changes of Policy or Methodology

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" Transcom, Inc. v. United States, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000).  "'The power of an administrative agency to administer a congressionally created . . . program

necessarily requires the formulation of policy . . . .'" Chevron 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Id. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the Chevron regime, agency discretion to reconsider policies is inalienable. See id. at 843. Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of Chevron which assumes and approves the ability of administrative agencies to change their interpretations. See, e.g., Maier, P.E. v. United States EPA, 114 F.3d 1032, 1043 (10th Cir. 1997), J.L. v. Social Sec. Admin., 971 F.2d 260, 265 (9th Cir. 1992), Saco Defense Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450-51 (D. Me. 1985). In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844.

Moreover, "'[a]n [agency] announcement stating a change in the method . . . is not a general statement of policy.'" American Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)). While a policy "denotes . . . [the] general purpose [of the statute] considered as directed to the welfare or prosperity of the state," BLACK'S LAW DICTIONARY 1157 (6th ed. 1990), methodology refers only to the "performing [of] several operations[] in the most convenient order," id. at 991; accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Co. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, P.E., 114 F.3d at 1043 (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology, that is, to take an act of statutory implementation while pursuing the same policy, should be examined under the Chevron test and sustained if the new methodology is reasonable. See, e.g., Koyo Seiko Co v. United States, 24 CIT ___, ___, 110 F. Supp. 2d 934, 942 (2000) (stating that "'the use

of different methods [of] calculati[on] . . . does not [mean there is a] conflict with the statute,'" quoting Torrington Co. v. United States, 44 F.3d 1572, 1578 (Fed. Cir. 1995)). Therefore, Commerce's decision to reject its initial decision to rely on Indian data and Commerce's consequential use of Indonesian data was a justifiable change of methodology as long as such change in position was reasonably supported by the record.


### 2.   Agency's Reconsideration of Its Determination After Issuance of Preliminary Results

An agency's reconsideration of its determination after issuance of preliminary results does not necessarily mean that the parties affected by the determination have been denied due process of law. A party subject to or affected by the review does not have a due process right to notice and comment on the agency's change in position if, throughout the agency's investigation, the party was reasonably on notice that the agency was considering the alternative ultimately used in the final determination. See Tehnoimportexport v. United States, 15 CIT 250, 255, 766 F. Supp. 1169, 1175 (1991) (holding that Commerce has no obligation to notify the parties beforehand that Commerce had chosen a surrogate country different from that designated in the initial determination); accord Kerr-McGee Chem. Corp. v. United States, 1999 U.S. App. LEXIS 2673 (Fed. Cir.  Feb. 19, 1999).

> [An agency] is not required to afford interested parties
> an unlimited opportunity to comment on each modification
> of the agency's practice or procedure.  To provide
> otherwise would be to unnecessarily burden the agency
> with an unending cycle of notices, comments, and
> responses.

British Steel PLC v. United States, 19 CIT 176, 255, 879 F. Supp.

1254, 1317 (1995).

_____

While Timken notes that "Commerce [did not] vet [sic.] the idea

of using Indonesian statistics during the comment period," Timken's

Mem. at 6 (emphasis supplied), Timken does not dispute that

Indonesia was an alternative surrogate choice that Commerce could

consider.[9]  See generally, Timken's Mem.  Therefore, Timken was on

notice about Commerce's possible choices of data and Indonesian data

in particular.  Because the number of alternative surrogates is very

small indeed, see 19 U.S.C. § 1677b(c)(4), had Timken felt that all

or some of the alternative choices were improper, Timken could have

disputed--and would not be overly burdened had Timken chosen to

dispute--these alternatives.  Timken's failure to exercise this

right in a timely manner did not create an obligation on the part

_____

[9] The Court searched long and hard through the briefs and the
exhibits provided by the parties for evidence verifying that
Indonesia was indeed named during the review as one of the
alternative surrogate choices, all to no avail.  The Court,
however, presumes that Commerce did name Indonesia as an
alternative choice because: (1) no party contests such presumption;
(2) all parties seem to operate under such presumption; and (3) 19
U.S.C. § 1677b(c)(4) allows Commerce to name a number of
alternative surrogates.

of Commerce to avail Timken to a second bite  of the apple in the

form of another "cycle of notices, comments, and responses."

British Steel PLC, 19 CIT at 255, 879 F. Supp. at 1317.


### 3.    Commerce's Decision to Use Indonesian Data

With respect to Timken's challenge to Commerce's decision to

use Indonesian values, the Court finds that Timken is assailing not

the reasoning but rather the result reached by Commerce, which is

outside the Court's standard of review.  See Writing Instrument

Mfrs. Ass'n, Pencil Section v. United States ("Writing Instrument"),

21 CIT 1185, 1195, 984 F. Supp. 629, 639 (1997).  During the review

at issue, Commerce conducted research, determined to use import data

from Indonesia, a producer of comparable merchandise, and explained

that

> [while, as] with the Indian data, [Commerce was] unable
> to isolate the value of [the] steel [at issue] or
> identify an eight-digit category . . . containing such
> steel imported into Indonesia; however, unlike the Indian
> data, the Indonesian six-digit category 7228.30 closely
> approximates the value of [United States] imports of
> [the] steel [at issue], as well as the comparable
> six-digit category in the United States.    Thus,
> [Commerce] determined  that Indonesian category 7228.30,
> which is the narrowest category, . . . is the best
> available information . . . .

Final Results, 62 Fed. Reg. at 6196 (pointing out that "Indonesia

has previously been used as a source of surrogate data in cases

involving the PRC" and citing Notice of Final Determination of Sales

at Less Than Fair Value: Certain Partial-Extension Steel Drawer
Slides with Rollers From the People's Republic of China, 60 Fed.
Reg. 54,472, 54,475-76 (Oct. 24, 1995); Notice of Final
Determination of Sales at Less Than Fair Value: Certain Cased
Pencils From the People's Republic of China, 59 Fed. Reg. 55,625,
55,629 (Nov. 8, 1994); Helical Spring Lock Washers, 58 Fed. Reg. at
48,835.

The Court is not in the position to declare such a conclusion
unreasonable.  See Chevron, 467 U.S. at 845.

Next, the Court rejects Timken's assertion that Commerce erred
in using United States data as benchmarks to test the reliability
of the Indian import data for valuing the merchandise at issue.  A
comparison of surrogate data to that of market economy in order to
determine the reliability of such surrogate data is within
"'Commerce's statutory authority and consistent with past
practice.'"  Peer Bearing Co. v. United States, 22 CIT 472, 481, 12
F. Supp. 2d 445, 455 (1998) (quoting Writing Instrument, 21 CIT at
1195, 984 F. Supp. at 639 (upholding use of United States benchmark
as a point of comparison for two possible surrogate values and
quoting, in turn, Olympia Indus., Inc. v. United States, 21 CIT 364,
369 (1997) (approving Commerce's use of data from other market
economies to test the reliability of surrogate country data))).

Commerce, therefore, acted within its statutory authority by utilizing United States data to aid in its FOPs valuation. See 19 U.S.C. §§ 1677b(c)(1) and (4); Peer Bearing, 22 CIT at 481, 12 F. Supp. 2d at 455.

Finally, Commerce could reasonably find Indian data unreliable because Commerce has never adopted a numerical standard for identifying aberrational or questionable data and has properly exercised its statutory discretion by determining what information to use for valuing FOPs on a case-by-case basis. Indeed, during other reviews, Commerce has rejected as unsuitable surrogate data which varied from a benchmark to a much lesser extent than in this particular case. See, e.g., Final Determination of Sales at Less Than Fair Value: Circular Welded Non-Alloy Steel Pipe From Romania, 57 Fed. Reg. 42,957, 42,958 (Sept. 17, 1992).

**V.    COMMERCE'S USE OF UNADJUSTED SKF INDIA'S OVERHEAD, SELLING, GENERAL AND ADMINISTRATIVE EXPENSES AND PROFIT RATES**

### A.    Background

Section 1677b(c)(1) of Title 19 requires Commerce to determine FMV of the subject merchandise on the basis of the value of the FOPs utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. See 19 U.S.C. §

1677b(c)(1). General expenses are the expenses that do not bear a direct relationship to the production of the merchandise at issue, such as SG&A expenses. The subsection also states that the valuation of FOPs "shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." Id. Section 1677b(c)(4) provides that, in valuing FOPs under paragraph (1) of § 1677b(c), Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries . . . ." 19 U.S.C. § 1677b(c)(4).

Commerce has interpreted "the extent possible" language contained in 19 U.S.C. § 1677b(c)(4) as applicable to the calculation of the amount of general expenses and profit that is to be added to the FOPs referenced in paragraph (1) of § 1677b(c). See Def.'s Mem. at 38 (citing Springfield Indus. Corp. v. United States, 842 F.2d 1284, 1285 (Fed. Cir. 1988) (citing, in turn, Chevron, 467 U.S. at 843-44, 865-66)).

Applying this interpretation during the review at issue, Commerce concluded that an appropriate surrogate for determining general expenses and profit was SKF India, an Indian producer of merchandise similar to the merchandise at issue. Consequently, Commerce determined overhead, SG&A, and profit rates from the

information contained in SKF India's financial report.  See Def.'s

Mem., Ex. 6 at 4-5; Final Results, 62 Fed. Reg. at 6193.

Specifically, Commerce calculated the ratio of SKF India's overhead

costs to its cost of manufacturing ("COM"), that is, the cost of

materials plus labor, and then applied this ratio to the Indonesian

and Indian raw material costs and direct labor costs.  Commerce

explained that,

> [i]n deriving these rates, [Commerce] used the SKF India
> data both with respect to the numerators (total overhead
> and SG&A expenses, respectively) and denominator (total
> cost of manufacturing).  This methodology allowed
> [Commerce] to derive ratios of SKF India's overhead and
> SG&A expenses.  These ratios, when multiplied by FOP[s]
> [Commerce] used in [Commerce's] analysis, thereby
> constitute the best available information concerning the
> overhead and SG&A expenses that would be incurred by a .
> . . producer given such FOP[s].

Final Results, 62 Fed. Reg. at 6193.


### B.    Contentions of the Parties

Timken argues that, if Commerce did not use the SKF India

report to value all FOPs, Commerce should adjust overhead and SG&A

rates to reflect the use of lower material and labor values from the

separate sources; that it would be distortive to include SKF India's

full materials and labor costs in the COM denominator unless SKF

India's full materials and labor costs were also the basis for

valuing the raw materials and direct labor factors in the

constructed value calculation.  See Timken's Mem. at 31-34 (relying

on Sigma Corp. v. United States ("Sigma"), 117 F.3d 1401 (Fed. Cir. 1997); Timken Co. v. United States ("Timken 1988"), 12 CIT 955, 699 F. Supp. 300 (1988), aff'd, 894 F.2d 385 (Fed. Cir. 1990)).  Timken proposed that: (1) Commerce multiply SKF India's total weight of materials by the average value of steel; and (2) the total number of hours worked at SKF India by the labor value used for material and labor figures that Commerce included in the overhead and SG&A calculations.  See id.

Commerce maintains that the methodology used allowed Commerce to derive internally consistent ratios of SKF India's overhead and SG&A expenses.  See Def.'s Mem. at 40-41; see also Final Results, 62 Fed. Reg. at 6193.  Commerce contends that doing otherwise, that is, adjusting the underlying values of SKF India, would create a result no longer representative of SKF India's costs.  See Def.'s Mem. at 40-41.  Specifically, Commerce pointed out that

> [Timken's] recommended adjustment would affect (reduce) the denominator, but it would leave the overhead and SG&A expenses in the numerator unchanged. As such, [Commerce] find[s] that this adjustment would itself distort the resulting ratio, rather than cur[e] the alleged distortion in [Commerce's] calculations.

Final Results, 62 Fed. Reg. at 6193.

Peer Bearing supports Commerce's conclusion and states that "Timken's assertion that the application of the overhead/SG&A/profit ratios (derived from SKF India) to the material and labor costs

(derived from other sources) 'mixes apples and oranges' and is incorrect." Peer Bearing's Resp. Pl. Timken's Mot. J. Agency R. of Feb. 18, 1998 ("Peer Bearing's Resp. of Feb. 18") at 16. Peer Bearing maintains that Commerce's application of ratios for overhead, SG&A and profit derived from one source to COM values derived from another one is consistent with Commerce's practice in other NME cases. See id. at 15-16 (citing Preliminary Determination of Sales at Less Than Fair Value: Coumarin From the People's Republic of China ("Coumarin"), 59 Fed. Reg. 39,727, 39,729 (Aug. 4, 1994); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the Republic of Romania, 61 Fed. Reg. 51,472 (Oct. 2, 1996) [sic]).[10]

## C. Analysis

"In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable." Timken Co. v. United States, 23 CIT ___, ___, 59 F. Supp. 2d 1371,

---

[10] The Court assumes Peer Bearing intended to cite Coumarin, 59 Fed. Reg. at 39,730, and Final Results and Rescission in Part of Antidumping Duty Administrative Review of Tampered Roller Bearings and Parts Thereof, Finished or Unfinished, From the Republic of Romania, 61 Fed. Reg. 51,427 (Oct. 2, 1996). The "consistent practice" argument fostered by Peer Bearing leaves this Court unconvinced. While an agency practice is a consideration with regard to the issue of agency execution of its responsibilities, a wrongful agency practice cannot be justified simply on the grounds that such practice is "continuous."

1377 (1999); see also Chevron, 467 U.S. at 844-45. Specifically, Commerce's authority to select appropriate surrogate data includes the authority to base a calculation on these data without adjustment, if such method is reasonable. See id.; see also Peer Bearing, 22 CIT at 481-82, 12 F. Supp. 2d at 456.

The Court is not convinced by Timken's reference to Sigma, 117 F.3d 1401 and Timken 1988, 12 CIT 955, 699 F. Supp. 300. Sigma stands for the proposition that Commerce shall support its determination by substantial evidence if Commerce claims comparability between the entity under investigation and that used as a surrogate. See 117 F.3d at 1409-10. Timken 1988, in turn, stands for the proposition that in order to value one type of raw material that is greatly disproportionate in value to the other type of raw material, Commerce must have reasonable justification supported by substantial evidence on the record. See 12 CIT 955, 699 F. Supp. 300.

In the case at bar, Commerce derived overhead, SG&A, and profit rates from SKF India's financial report; thus, SKF India's rates are supported by substantial evidence on the record. Commerce also explained that the adjustment suggested by Timken would distort the experience of SKF India rather than cure any distortion in Commerce's calculation. See Final Results, 62 Fed. Reg. at 6193.

Moreover, the record does contain sufficient information regarding the surrogate, that is, SKF India, for purposes of the overhead, SG&A and profit calculations.[11]

Although the Court could certainly question the perfection of Commerce's approach, the Court holds that, under the circumstances, Commerce acted reasonably in not subtracting import duties from SKF India's data.  Commerce attempted to capture in its rate calculation the surrogate company's experience in incurring overhead and SG&A expenses, and created a reasonable internally consistent ratio that, as imperfect as it might be, does not violate the boundaries set by 19 U.S.C. § 1677b(c).  While the Court agrees with Timken's contention that a factor chosen by Commerce should be fixed to a particular figure within  parameters of a single determination, it does not follow that the ratio applied by Commerce to the factors under consideration should necessarily be derived from the fixed factors.  The mere fact that one of the actual factors is likely to be higher while the other one is likely to be lower than the corresponding data derived from the records of SKF India does not

---

[11]     Timken argues that Commerce could have exactly calculated the customs duties and import charges incurred by SKF India merely because the record shows the total material cost, the percent imported, and the cost of insurance and freight of SKF India's imports.  See Timken Mem. at 33-34. It does not follow from this list, however, that Commerce knows how much of these import costs are attributable to import duties.

empower the Court to uphold Timken's suggestion as a more palatable

alternative.  See American Spring Wire, 8 CIT at 22, 590 F. Supp.

at 1276 (stating that "[t]he court may not substitute its judgment

for that of the [agency] when the choice is 'between two fairly

conflicting views, even though the court would justifiably have made

a different choice had the matter been before it de novo'" and

quoting Penntech Papers, 706 F.2d at 22-23 (quoting, in turn,

Universal Camera, 340 U.S. at 487-88)).

**VI.  COMMERCE'S USE OF LABOR DATA FROM INVESTING, LICENSING & TRADING CONDITIONS ABROAD, INDIA**

**A.    Background**

In determining direct labor costs, Commerce, instead of using

SKF India's labor costs, used public source data from Investing,

Licensing & Trading Conditions Abroad, India ("ILT"), released by

the Economist Intelligence Unit in November 1993.  See Preliminary

Results, 60 Fed. Reg. at 49,575.   Commerce explained that

> [Commerce] prefer[s] published surrogate import data to
> the SKF [India's] data in valuing the material FOP for
> the following reasons.  First, [Commerce is] able to
> obtain data specific to the [period of review], which
> more closely reflect the costs to producers during the
> [period of review].  Second, the raw material costs from
> the SKF [India's] report do not specify the types of
> steel purchased by SKF [India].   The record does not
> indicate whether SKF purchased bar steel (the type used
> by the Chinese manufacturers) or more expensive tube
> steel to produce bearings parts.    Third, although
> [Commerce] agree[s] with [Timken's] point that SKF

[India's] is a producer of subject merchandise, the report also identifies other products it manufactures.

Final Results, 62 Fed. Reg. at 6193.


### B.    Contentions of the Parties

Commerce asserts that it does not focus upon a particular surrogate producer of subject merchandise if more objective, industry-wide values (such as ILT rates) are available because: (a) the surrogate producer is not the subject of the valuation; (b) Commerce's goal is to use surrogate values that represent the industry norm of the surrogate country, not company-specific surrogate values; and (c) Commerce prefers to value factors using public information that is most closely concurrent to the specific period of review ("POR").  See Def.'s Mem. at 7, 44.

Peer Bearing supports Commerce, stating that Commerce was not required to use SKF India's labor costs, and points out that Commerce could use diverse surrogate sources.  See Peer Bearing's Resp. of Feb. 18 at 17.

Timken argues that if the use of SKF India's unadjusted overhead, SG&A and profit rates were reasonable, then Commerce should be required to use SKF India's labor costs.  See  Timken Mem. at 36.

C.    Analysis

The applicable provisions state that

the valuation of the factors of production shall be based
on the best available information regarding the values of
such factors in a market economy country or countries .
. .

. . . .

. . . unitiz[ing], to the extent possible, the prices or
costs of factors of production in one or more market
economy countries that are--(A) at a level of economic
development comparable to that of the nonmarket economy
country, and (B) significant producers of comparable
merchandise.

19 U.S.C. §§ 1677b(c)(1) and (4).

Although the provisions specifically refer to "costs . . . in one or more market economy countries" rather than private entities, id. (emphasis supplied), the reasonableness of using a particular value must be determined on a case-by-case basis.   See, e.g., Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 406, 636 F. Supp. 961, 967 (1986).

In the case at bar, SKF India's labor expenses were an element included in the denominator of Commerce's calculation of the ratio for overhead, SG&A and profits.   Commerce, therefore, effectively made an election for the particular factor of production

and supported such election with a sufficient record and reasoning.[12]

This Court holds that, within parameters of each administrative determination, Commerce is bound to each election Commerce makes. While Commerce is entitled to use different surrogate sources in making an election, see Timken, 2001 Ct. Intl. Trade LEXIS 100 at *30-38, Slip Op. 01-96 at 24-30, it would be anomalous to suggest that the statutory format creates a mode allowing Commerce to use different figures as a substitute for the very same factor. Cf. SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (pointing out that "Commerce cannot give the term . . . a different definition . . . in the same proceeding"). Under the mandate of Chevron, 467 U.S. at 844-45, which requires courts to give substantial deference to a reasonable agency determination, such mode would leave the members of the regulated industry at the whim of their regulatory agency, thereby condoning a possible abuse of the agency regulatory power.

In sum, Commerce's decision to use ILT data rather than SKF India's data in determining labor costs was unreasonable in view of Commerce's use of SKF India's data for the calculation of the

---

[12] Indeed, Commerce maintains that Commerce's methodology allowed Commerce to derive an internally consistent ratio. See Def.'s Mem. at 40-41; see also Final Results, 62 Fed. Reg. at 6193.

overhead, SG&A and profit rates.  Therefore, this issue is remanded to Commerce to redetermine direct labor costs on the basis of SKF India's data on labor (supplemented by facts otherwise available only to the extent necessitated by the insufficiency, if any, of SKF India's data currently on the record).

## VII. Commerce's Adjustment

### A.    Background

Section 1677a(e) of Title 19 provides for deduction from ESP of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise . . . ."  19 U.S.C. § 1677a(e) (1988).  When an adjustment is granted to ESP, Commerce's regulation, 19 C.F.R. § 353.56 (1994), permits an ESP offset to FMV up to the amount of indirect selling expenses incurred in the United States.  See Torrington Co. v. United States, 82 F.3d 1039, 1048-49 (Fed. Cir. 1996) (stating that Commerce may adjust FMV pursuant to the ESP offset by the amount of indirect selling expenses incurred in making foreign sales).

During the review at issue, Timken contended that Commerce should subtract only the portion of SG&A that is attributable to indirect selling expenses.  Commerce agreed with Timken and stated that, "in conformity with section 353.56 . . . , [Commerce makes the

ESP offset to FMV] in an amount not . . . exceed[ing] indirect selling expenses incurred in the United States." Final Results, 62 Fed. Reg. at 6203. Commerce based this offset on the "other expenses" item from the SKF India's report, and "subtracted from [that] item the amount for debentures as indicated in a footnote to 'other expenses'" in the SKF India's report. Id. Commerce pointed out that

> [t]he SKF [India's] report notes that the general category of expenses containing the "other expenses" item includes "selling expenses." However, none of the [specifically] named items (e.g., "power and fuel") pertain to selling expenses. [Commerce has] concluded that, as suggested by [Timken], the "other expenses" item, minus debentures, represents these "selling expenses."

Id.


### B.    Contentions of the Parties

Timken asserts that Commerce's explanation about the "other expenses" in SKF India's report "admits" that the ESP offset was not limited to selling expenses but includes such non-selling expenses as power and fuel. See Timken's Mem. at 39-40. Accordingly, Timken argues that Commerce should either make no ESP offset adjustment to FMV at all or make a reasonable estimate of what portion would be indirect selling expenses. See id. at 43. Timken contends that because the "ESP offset" process is derived from the language of a regulation rather than a statute, "it would in no way fall short of

any statutory mandate for [Commerce] to decline to make the offset, rather than making it on the basis of overly-broad data. Moreover, not making the offset would be consistent with the rule that remedial statutes are to be liberally construed to effectuate their purpose of protecting [United States] industry." Id. at 42.

Commerce maintains that it "did not admit in the Final Results, 62 Fed. Reg. [at 6203,] that [Commerce] included in the ESP offset non-selling expenses." Def.'s Mem. at 46. Commerce explains that, after extracting from SKF India's report individual line items representing non-selling expenses, such as power and fuel, Commerce concluded that the "other expense" category contained, in general, only selling expenses and, in particular, only indirect selling expenses for which the ESP offset adjustment was appropriate. See id. (citing Final Results, 62 Fed. Reg. at 6203, Comment 14).

Peer Bearing supports Commerce's position and asserts that "Timken misunderstands the breakout of expenses" in the SKF India's report. Peer Bearing's Resp. of Feb. 18 at 18.

## C.   Analysis

The relevant expense category in the SKF India's report is headed "Manufacturing and Other Expenses Profit & Loss Account" and includes the following items: (a) "Stores and spares consumed"; (b)

"Power and fuel"; (c) "Repairs to buildings"; (d) "Repairs to Machinery"; (e) "Insurance"; (f) "Rates and taxes"; (g) "Rent"; (h) "Director's commission"; (i) "Royalty"; (j) "Other expenses"; and (k) "Profit (less loss) on fixed assets sold, scrapped."  Def.'s Mem., Ex. 8.  The item "Manufacturing and other expenses," in turn, includes the following four designations: (1) "Contribution to provident and other funds . . ."; (2) "Included in stores and spares consumed is the debit in respect of tools"; (3) "Auditors' remuneration"; and (4) "Debenture issue expenses."  Id., Ex. 9.

While Timken reads the selling expenses figure to include "an undefined array of 'other expenses' as well," Timken Mem. at 40, the Court believes that Timken is either: (1) misreading the evidence; or (2) assailing the very conclusion reached by Commerce rather than Commerce's mode of reasoning.  However, the result reached by Commerce, unlike the logistics of Commerce's determination, is outside the Court's standard of review.  See Writing Instrument, 21 CIT at 1195, 984 F. Supp. at 639.

The Court finds Commerce's reading and application of the evidence reasonable because: (1) none of the other items in the category "Manufacturing and Other Expenses Profit & Loss Account" pertain to selling expenses and, thus, it was reasonable for Commerce to conclude that selling expenses were captured in the

"other expenses" item; and (2) the list of "other expenses" includes only one designation not pertaining to selling expenses, namely, "Debenture issue expenses" and, thus, it was reasonable for Commerce to conclude that, "after the deduction of debenture issue expenses, the remaining '[o]ther expenses' contain [the best available list of] selling expenses."  Def.'s Mem. at 47.

Timken's suggestion that Commerce, in dealing with imperfect evidence, should simply decline to make any use of such evidence and refuse the ESP offset adjustment because "remedial statutes are to be liberally construed to effectuate their purpose of protecting [United States] industry," Timken's Mem. at 42, is equally unpersuasive.  The whole body of the antidumping duty law is largely remedial in nature, see Badger-Powhatan, a Div. of Figgie Int'l, Inc. v. United States, 9 CIT 213, 608 F. Supp. 653 (1985), appeal dismissed, 808 F.2d 823 (Fed. Cir. 1986), but it does not follow that the application of antidumping provisions should, instead of leveling the playing field, give an unfair advantage to the domestic industry each time Commerce is forced to deal with less than perfect evidentiary data.[13]  Indeed, such requirement would run against the gist of the whole body of the antidumping duty law because its

---

[13] In the case at bar, such requirement would create an outcome contrary to the very gist of 19 C.F.R. § 353.56, forcing Commerce to refuse certain respondents the ESP offsets while granting the ESP deductions to the corresponding United States prices.

implementation could paralyze nearly all Commerce's regulatory and investigatory activity.

**VIII.    Commerce's Calculation of Marine Insurance**

In its final determination, Commerce calculated marine insurance using a publicly available rate for sulphur dyes and multiplying this rate by the packed weight of the merchandise at issue, specifically, bearings. See Final Results, 62 Fed. Reg. at 6204. As this Court pointed out in Timken, 2001 Ct. Intl. Trade LEXIS 100 at *60-61, Slip Op. 01-96 at 50-51, Commerce's reliance on a weight-based methodology was flawed.

Insurers agreeing to pay the value of merchandise lost or destroyed in transit base their premium rates on what it would cost to replace the merchandise or compensate the losses rather than upon the weight of the merchandise being shipped. See Peer Bearing, 22 CIT at 486, 12 F. Supp. 2d at 458-59 ("Insurance by definition is based upon pecuniary valuation, not on the weight of the product to be insured"). The Court, therefore, remands this issue to Commerce to determine marine insurance in a manner related to the value and the risk of transporting tapered roller bearings.

## IX.  Commerce's Use of Shanghai General's Market Economy Import Data

### A.    Background

During the review period, Shanghai General imported a significant part of its steel input from market economy countries, purchasing such steel directly from a market economy supplier and paying with market economy currency.  See Final Results, 62 Fed. Reg. at 6198-99.  In view of the significant portion of steel input purchased under market economy conditions, Commerce used Shanghai General's data concerning such imports, rather than surrogate data, to value Shanghai General's raw materials FOP.  See id.

### B.    Contentions of the Parties

Timken contends that Shanghai General's margin in this review was erroneously calculated.  Timken argues that since a portion of the FOP valued was obtained from domestic NME sources, Commerce should have averaged the prices Shanghai General actually paid in free market transactions with surrogate values used in substitute for the domestic NME sources.  See Timken's Mem. at 48-52.  Timken urges that Commerce revert to the methodology applied in the Preliminary Results by valuing: (1) Shanghai General's imports at their actual purchase price; and (2) steel purchased from the PRC at the assigned surrogate rate.  See 60 Fed. Reg. at 49,574.

Commerce maintains that Commerce's actions were in accordance with law, as interpreted and applied in Lasko Metal Prods., Inc. v. United States, 16 CIT 1079, 810 F. Supp. 314 (1992), and Tianjin, 16 CIT 931, 806 F. Supp. 1008. See Def.'s Mem. at 49-50. Shanghai General supports Commerce's assertion and points out that Commerce's actions were in accordance with law and with Commerce's established practice of using actual prices instead of surrogate values when an NME producer has purchased certain inputs from market-economy suppliers and paid for them in a market-economy currency. See Shanghai General's Mem. P. & A. Opp'n Pl.'s Mot. J. Agency R. ("Shanghai General's Mem.") at 29-30.

## C.    Analysis

The applicable statute provides that, when dealing with imports from an NME country such as the PRC, Commerce shall determine the FMV of the subject merchandise based on FOPs utilized in producing the merchandise. See 19 U.S.C. § 1677b(c)(1). The statute further provides that Commerce shall value the reported FOPs based on the BIA regarding the values of FOPs in an appropriate market economy. See id.; see also Union Camp Corp. v. United States, 20 CIT 931, 933-34, 941 F.Supp. 108, 111-12 (1996). While conducting NME investigations, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries

that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." See 19 U.S.C. § 1677b(c)(4).

Commerce's "task in [an NME] investigation is to calculate what [the] costs or prices would be [in the NME] if such prices or costs were determined by market forces." Tianjin, 16 CIT at 940, 806 F. Supp. at 1018. Therefore, Commerce estimates the FMV by doing the following: (1) isolating each FOP process in the NME; (2) choosing a surrogate market economy country at a comparable level of economic development that produces comparable merchandise; (3) assigning a value to each FOP equal to its cost in the surrogate country; and (4) adding to those values an estimated amount for profit and general expenses. See Nation Ford Chem. Co. v. United States, 21 CIT 1371, 985 F. Supp. 133 (1997).

In applying the FOP methodology to an NME, if Commerce finds that such actual costs represent the BIA, Commerce has the discretion to take a combined approach and to consider actual costs paid by the NME producer for each FOP. See Lasko Metal Prods., 43 F.3d at 1445-46; Magnesium Corp. of Am. v. United States, 20 CIT 1092, 1098, 938 F. Supp. 885, 892 (1996). The statute does not specify what constitutes BIA, nor does it prescribe a specific method for valuing FOP when a portion of the factor to be valued

represents a source in the NME itself and a portion of the same FOP represents a source obtained from a market-economy supplier and paid for in market economy currency.

"Where an input was sourced from a market economy and paid for in market economy currency, [Commerce] use[s] the actual price paid for the input to calculate [FMV] in accordance with [Commerce's] practice." Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China, 62 Fed. Reg. 61964, 61966 (Nov. 20, 1997) (citing Lasko Metal Prods., 43[] F.3d at 144[6], and outlining Commerce's practice at the time of the review at issue); see Final Determination of Sales at Less Than Fair Value: Coumarin From the People's Republic of China, 59 Fed. Reg. 66,895, 66,897 (Dec. 28, 1994); accord Preliminary Results of Antidumping Duty Administrative Review of Porcelain-on-Steel Cooking Ware From the People's Republic of China, 63 Fed. Reg. 1434, 1436 (Jan. 9, 1998); Final Results of Antidumping Duty Administrative Review of Industrial Nitrocellulose From the People's Republic of China, 62 Fed. Reg. 65,667, 65,670 (Dec. 15, 1997); Notice of Final Determination of Sales at Less Than Fair Value: Brake Drums and Brake Rotors From the People's Republic of China, 62 Fed. Reg. 9160, 9163 (Feb. 28, 1997); Notice of Final Determination of Sales

at Less Than Fair Value: Bicycles From the People's Republic of
China, 61 Fed. Reg. 19,026, 19,029 (April 30, 1996).

In the case at bar, although a part of the FOP was purchased
domestically in the NME, Commerce utilized actual prices paid in
market economy currencies to market economy suppliers to value the
entire FOP. Commerce reasons that,

> [b]ecause the statute does not explicitly address the
> situation in which an NME producer imports some inputs
> from market economies . . . , [Commerce] has determined
> that if an NME producer reports prices that are based on
> inputs from market-economy suppliers, it is appropriate
> to use those prices instead of a surrogate value, if the
> amounts purchased are meaningful, i.e., they are not
> insignificant. [Commerce] has applied this practice
> consistently in recent years . . . .[14]

---

[14] Commerce's practice has been codified in Final Rule on
Antidumping Duties; Countervailing Duties ("Final Rule"), 62 Fed.
Reg. 27,296 (May 19, 1997). The Final Rule provides that:

> [Commerce] normally will use publicly available information
> to value factors. However, where a factor is purchased from
> a market economy supplier and paid for in a market economy
> currency, [Commerce] normally will use the price paid to the
> market economy supplier. In those instances where a portion
> of the factor is purchased from a market economy supplier and
> the remainder from a nonmarket economy supplier, [Commerce]
> normally will value the factor using the price paid to the
> market economy supplier.

Calculation of normal value of merchandise from nonmarket economy
countries, 62 Fed. Reg. at 27,413, § 351.408(c)(1).

Although the Final Rule was issued three months after the
Final Results at issue, Commerce applied the aforesaid methodology
prior to the release of the Final Rule. See e.g., Notice of
Preliminary Determination of Sales at Less Than Fair Value and
Postponement of Final Determination: Collated Roofing Nails From

Final Results of Antidumping Duty Administrative Review of Certain
Helical Spring Lock Washers From the People's Republic of China, 62
Fed. Reg. 61,794, 61,796 (Nov. 19, 1997).

Thus, Commerce, if the proportion of the market economy
purchases are "meaningful" or "significant," values the entire FOP
using the price paid in the market economy.  The record supports
Commerce's conclusion that Shanghai General's market purchases were
"meaningful" and "significant."  See Final Results 62 Fed. Reg. at
6191.

Similarly, the statute does not require Commerce to resort to
a weighted average methodology when valuing FOPs where: (1) only a
portion of the FOP to be valued is sourced by the NME producer
domestically; and (2) another portion is purchased by the NME

---

the People's Republic of China, 62 Fed. Reg. 25,899, 25,902 (May
12, 1997) ("For those inputs . . . that were sourced (either
partially or totally) from a market economy and paid for in market
economy currency, [Commerce] use[s] the actual price paid for the
input to calculate the factors-based NV in accordance with our
practice."  Moreover, the Final Rule differs insignificantly from
Notice of proposed rulemaking and request for Public Comments on
Antidumping Duties; Countervailing Duties ("Proposed Rule"), 61
Fed. Reg. 7308, Calculation of normal value if sales are made at
less than cost of production, 61 Fed. Reg. 7383, 7384, §
351.406(c)(1) (Feb. 27, 1996), published almost a year before the
issuance of the Final Results at issue.  In promulgating the
Proposed Rule and Final Rule, Commerce explained that one of the
objectives of the issuance of these Rules was to articulate
Commerce's ongoing practice.  See Final Rule, 62 Fed. Reg. at
27,413; Proposed Rule, 61 Fed. Reg. at 7384.

producer in an arm's-length transaction from market economy sources and paid for in market economy currency. See Nation Ford Chem., 21 CIT at 1376, 985 F. Supp. at 137 (holding that nothing in the statute prohibits Commerce from valuing the FOP as it did because Commerce does not have to duplicate the exact production experience of an NME manufacturer at the expense of choosing a surrogate that most accurately represents the FMV of the surrogate in the hypothetically created "market-economy" version of the NME).

While the Court agrees with Timken's contention that there could indeed be better information, such as statistics from India, Indonesia or the United States, upon which Commerce could have based its determination, the issue is whether Commerce reasonably exercised its discretion in choosing actual prices paid in lieu of a weighted average of actual prices paid and surrogate prices. The Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

Next, the antidumping law provides that Commerce may revoke antidumping duty orders under appropriate circumstances. See 19

U.S.C. § 1675(c) (1988).  "[T]he statute le[aves] much to Commerce's discretion regarding the revocation of orders." Kemira Fibres OY v. United States, 61 F.3d 866, 873 (Fed. Cir. 1995), see Timken Co. v. United States, 21 CIT 1313, 1325, 989 F. Supp. 234, 244 (1997) ("[T]he statute grants Commerce wide discretion in making such a determination . . . .")  Commerce's authority to revoke antidumping duty orders, either entirely or in part, is reflected in 19 C.F.R § 353.25 (1994).  The regulation provides three requirements for Commerce to exercise its authority to revoke an order: (1) "One or more producers or resellers covered by the order have sold the merchandise at not less than foreign market value for a period of at least three consecutive years"; (2) "It is not likely that those persons will in the future sell the [subject] merchandise at less than foreign market value"; and (3) "[P]roducers or resellers that . . . previously . . . have sold the [subject] merchandise at less than foreign market value, . . . agree in writing to their immediate reinstatement in the order, . . . if [Commerce] concludes . . . that . . . , subsequent to the revocation, [these parties] sold the [subject] merchandise at less than foreign market value."  19 C.F.R § 353.25.

In the case at bar, Shanghai General appropriately requested partial revocation pursuant to 19 C.F.R § 353.25(b), and Commerce, after examining evidence on the record, found each of the three

requirements of the regulation satisfied.  See Final Results, 62
Fed. Reg. at 6213-14.  Considering that there is a satisfactory
record compiled by Commerce, it is not the position of the Court to
question anything but the reasonableness of Commerce's argument.
See Christensen, 529 U.S. at 588; Southern Cal. Edison, 226 F.3d at
1356 (quoting Martin v. Occupational Safety and Health Review
Comm'n, 499 U.S. 144, 151 (1991)).

Based on the foregoing, the Court concludes that Commerce
acted reasonably in: (1) refusing to resort to a weighted average
methodology; (2) utilizing actual prices paid in market economy
currencies to market economy suppliers to value the entire FOP; and
(3) granting Shanghai General partial revocation of the applicable
antidumping duty order.

**CONCLUSION**

The case is remanded to Commerce to: (1) correct the clerical
error resulting from the application of BIA to certain models for
which FOPs were available; (2) redetermine direct labor costs on
the basis of SKF India's data on labor (supplemented by facts
otherwise available only to the extent necessitated by the
insufficiency, if any, of SKF India's data currently on the
record); and (3) determine marine insurance in a manner related to

the value and the risk of transporting tapered roller bearings.

Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     October 25, 2001
           New York, New York